UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD MALONE,

                    Petitioner,                    Case Number: 05-10151
                                                   Honorable David M. Lawson
v.

TERRY SHERMAN,

                    Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, Donald Malone, presently confined at the Gus Harrison Correctional Facility in Adrian, Michigan, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was found guilty of first-degree murder and felony firearm in the Detroit, Michigan Recorder's court. He was sentenced to life imprisonment for the first-degree murder conviction, plus a consecutive two-year term for the felony firearm conviction. The petitioner's conviction was obtained in part by disputed identification evidence, which generated a state supreme court opinion. However, the claims he raises in his habeas corpus petition do not implicate that opinion. Instead he alleges error in post-conviction proceedings in which he claimed that the state trial judge deprived him of due process of law when he erroneously refused to grant him a new trial based on newly discovered evidence; the prosecutor engaged in misconduct through her leading questions that resulted in her giving unsworn, un-cross-examined testimony and by knowingly introducing perjured testimony; and his trial and appellate counsel were constitutionally ineffective. The warden has filed an answer to the petition asserting that the claims lack merit or are procedurally defaulted. The Court concludes that the claims lack merit. Therefore, the petition will be denied.

## I.

The petitioner's convictions arise from the shooting death of Orlando Randy Nance on July 26, 1988 in an alley outside a market in Detroit, Michigan. The petitioner was charged with first-degree murder and possession of a firearm during the commission of a felony. Nance was shot in what turned out to resemble a drug-related execution. The identity of the shooter was the hotly-contested issue at trial.

The prosecution's main trial witness was Melvin Mann, who at one time was a suspect in the killing. He testified that he took Nance to the market on the day of the shooting because, he said, Nance wanted to talk to a girl who worked at the market. When they got to the market, he and Nance both went into the store. Mann needed to make a call at a telephone booth outside the market, so he got some change from Nance and he left the store to make his call. When Nance came out, he asked Mann, who was still on the phone, for the keys to the blue Jeep-like vehicle they were driving. Mann gave him the keys to the Jeep, and Nance got in the driver's side of the car.

Mann testified that Nance sat in the Jeep, waiting for him to get off the phone, when Mann heard some shots being fired. Mann dropped the phone and ducked because he said he w7as scared. He testified that he saw the petitioner running from the back of the vehicle.

Subsequently, Mann said that Nance got out of the Jeep and began running toward him, holding his chest. Mann testified that Nance said to him, "They got me." Tr. 4-6-89 at 84. Mann said that he then left the scene to get help. When he returned with his friends, the police were there. Mann did not talk to the police at that time, but a few days later, the police located Mann at a friend's house and arrested him for the murder of Nance.

Mann testified that he took the seat cover off the front seat of the Jeep and threw it into the garbage. He said he did not want to look at it because of the bullet holes that were in the cover. He said that he then put the Jeep in a friend's garage and hid the keys. Eventually, Mann told the police the whereabouts of the keys to the Jeep and the seat cover when he spoke to the police on July 31, 1988. He explained that the reason why he did not approach the police was because he was going to attempt to kill the petitioner himself.

Mann testified that Nance was his friend and they sold drugs together. When questioned by the police about what he saw on the day of the shooting, Mann told them "I saw a light skinned guy running towards the alley." Tr. 4-6-89 at 100. But Mann also testified that he did not like the petitioner. He also stated that there had been problems between the two of them, and that Nance "had trouble" with "A lot of people." *Id.* at 109-10.

Chaka Bell, another prosecution witness, testified at trial but would not confirm the description of the shooter she had given the police during the investigation. He was twelve years old and was a customer in the market on the day of the shooting. He admitted signing a written statement to the police shortly after the incident but denied that the description contained in the statement was his because he "didn't see nobody." *Id.* at 178. Ostensibly to impeach Mr. Bell's testimony, the prosecution called Dennis Richardson, a police officer with the Detroit Police Department who interviewed Mr. Bell after the incident. Richardson testified that Mr. Bell wrote "I have read this. It is the truth." on a statement prepared by Mr. Richardson. Tr. 4-10-89 at 21. He read several lines of the statement into the record, including the description of a man he saw running away from the parking lot with a gun in his hand: "Guy with the gun, black male, light-skinned, black hair, short. The guy wasn't tall; he was medium build." *Ibid.* The Court instructed

the jury that the statement was to be considered for impeachment purposes only, and not as substantive evidence. *Id.* at 23.

Robin Lasenby, another eyewitness, testified that on July 26, 1988 he was four or five houses away from the market where the shooting took place. He said that he was with Carey Jackson and others playing cards in the street on top of a car. Lasenby testified that he was headed home after the card game ended, and he noticed two men jump out of a black Omni and run toward the Puritan Super Foods market. Lasenby was able to identify the petitioner as one of the two men because he had seen him around the neighborhood for a couple of years. It appeared to Lasenby that the petitioner was carrying a dark object in his hand. Lasenby said that about a minute later, he heard three loud sounds that could have been gunfire, and he saw the men running back to the car and the car sped away.

Lasenby said that about four or five days later, the petitioner approached Lasenby as he was walking down the street and told him, "I heard you know something." Tr. 4-5-89 at 219. Lasenby responded that it was "none of his business" and he did not have "anything to do with it whatsoever." *Id.* at 220.

Lasenby's testimony was inconsistent with his initial statement to the police. The police, in an attempt to solve the murder, went door-to-door in the neighborhood where the shooting took place, asking various individuals if they had seen or heard anything on that particular day. When the police approached Lasenby's home and asked him some questions, he denied seeing or hearing anything. Lasenby, after being requested to testify at a preliminary hearing and failing to appear, was jailed for "three or four days." Tr. 4-5-89 at 225. Lasenby explained that his mother "[g]ot

[him] to make a statement because she felt frightened for her safety or whatever." *Id.* at 228-229.

Carey Jackson, who had been detained by the police as a material witness, testified and confirmed that he had been with Lasenby when the shooting occurred. However, he stated that he could not identify either of the men that had gotten out of the car. Jackson denied identifying the petitioner at a photographic show-up. When questioned about his earlier signed statement identifying the petitioner as one of the men getting out of the car, Jackson denied that the statement or the signature was his. The following exchange took place:

> Q.      [by prosecutor] And you told me at that time that you had made parts of this statement, didn't you?
> A.      Yes, I did.
> Q.      And you identified to me parts of the statement that you had made? [defense objection on grounds that the prosecuting attorney was testifying overruled]
> Q.      Did you or did you not tell me at that time, I believe it was the 30th of March, last Thursday, that you made some of the things in this statement?
> A.      I did.
> Q.      And did you or did you note with Investigator Marvin Butler from Homicide sitting right there tell me that this was, in fact, your signature?
> A.      No, I didn't.
> Q.      You didn't?
> A.      (No verbal response.)

Tr. 4-5-89 at 249-51.

The prosecution also introduced the testimony of James Hall, an attorney who was present at the photographic show-up with Jackson to ensure that the presentation was fair. He testified that Jackson identified the petitioner as the guy who had the gun and signed a statement confirming that identification. Although Hall did not actually witness the signing of the statement, he believed that the petitioner did sign the document. Hall testified that the photographic show-up was fair.

Sergeant James Bivens, the police officer that was in charge of the investigation, testified over the objections of defense counsel about the photographic show-up session he had had with Jackson. When questioned about the photographic display, Bivens testified that he recalled Jackson picking the petitioner's picture from the photographs displayed. Sergeant Bivens related Jackson's comments: "Number six, he stated that number six is the one that had the gun." Tr. 4-10-89 at 50. The petitioner's photograph was number six in the array.

Detroit Police Officer Marvin Butler assisted Sergeant Bivens in the investigation. He and Bivens canvassed the neighborhood, asking individuals at each home if they observed anything. In that survey, Officer Butler encountered Jackson, who denied seeing or hearing anything. About one week later, and after receiving a tip, the officers picked up Jackson and took him to the police station, where they took a written statement from him.

In that statement, which was admitted into evidence over defense objection for the purpose of impeaching Jackson's testimony denying that he gave a written statement to the police, Officer Butler testified that Jackson said that he saw the black car pull up and saw the petitioner and another guy get out of the car. According to Butler, Jackson said that he saw the petitioner running toward the market and then heard three shots being fired. Officer Butler testified:

> Q. Did he then tell you what he saw Donald Malone doing after that, after he heard those three shots?
> A. Yes, he did.
> Q. What did he say?
> A. He said, "Then the next thing I saw was Donald Malone and this other guy came running out of the same alley, and Donald Malone had a black pistol in his right hand, and was holding his mouth with his left hand."
> . . .
> Q. What is the next thing that he told you?
> A. He said, "They both ran back to the black Omni that had pulled down about four houses from Cherry's house, Cherry Hood's house. They jumped in the car, and the car sped off fast."

Tr. 4-6-89 at 33-34. Officer Butler testified that Jackson told him that he knew the petitioner for about seven or eight years. Officer Butler signed the statement next to Jackson's signature.

The prosecution called as another eyewitness Clarence Pore, who was sitting in his car across the parking lot from the store at the time of the shooting. He testified that he heard the shots, got out of his car, and saw the victim on the ground. He saw a man come over, look at the victim, and then get in his vehicle and speed off. He only saw a single person in the vehicle, but the manner in which the person entered the vehicle suggested to him that there was another person in the vehicle. He did not see anyone running at the scene.

Yolanda Cherry was called by the prosecution. On July 26, 1988, she sent a message to Mann's pager, and Mann called her approximately fifteen minutes later. The two of them spoke for approximately six minutes until she heard gunshots in the background. She testified that Mann dropped the phone and she heard him say "No, man, no." Tr. 4-10-89 at 34.

Renate McCoy had been subpoenaed by the prosecution, but the state sought to waive her attendance. The defense objected, but eventually both sides agreed on a stipulation as to her likely testimony. Before the prosecution rested, the jury was informed of the following:

> MS. WORTHY: Your Honor, there's one further stipulation: That if Renate McCoy, R-e-n-a-t-e, were present, she would testify to the following, that the following question was asked of her: "Did you recognize the person that had the gun?" The answer: "No, but he was a black male, early 20s, light complexion, six feet tall, about a hundred and seventy pounds, short haircut, wearing an orange T-shirt, blue jeans, blue and white or black and white gym shoes. He had a black pistol in his right hand."

> THE COURT: Mr. Curtis?

> MR. CURTIS: Your Honor, that is a correct statement as to the testimony, what would be the testimony of Renate McCoy if she was called, and that we thereby – by entering into this stipulation – waive her production for purposes of the jury to hear.

Tr. 4-10-89 at 87-88.

The jury found the petitioner guilty of first-degree murder and felony firearm. On April 25, 1989, the trial court sentenced the petitioner to life imprisonment plus a two-year consecutive term for the felony firearm conviction. Thereafter, the petitioner filed a direct appeal in which his appointed attorney raised claims challenging the out-of-court identification evidence and related jury instructions, and prosecutorial misconduct in the form of improper arguments to the jury. The petitioner himself filed a supplemental brief adding issues dealing with false evidence introduced through the out-of-court identification statements, the insufficiency of the evidence, and withholding evidence that could contradict the prosecution's main witness.

On April 6, 1992, the Michigan Court of Appeals affirmed the petitioner's convictions in a published opinion. *People v. Malone*, 193 Mich. App. 366, 483 N.W.2d 470 (1992). The petitioner then filed an application for leave to appeal in the Michigan Supreme Court raising all five of the appellate issues presented to the court of appeals by counsel and the petitioner. The supreme court granted the petitioner's application for leave to appeal on the issue of "whether the trial court acted properly in admitting as substantive evidence the testimony of two witnesses that a witness who denied having identified the defendant at trial had previously identified him at a photographic showup." *People v. Malone*, 445 Mich. 369, 370, 518 N.W.2d 418, 419 (1994). On June 14, 1994, the court affirmed the petitioner's convictions in a published opinion. *Ibid.*

On April 17, 1997, the petitioner filed a *pro se* motion for relief from judgment with the trial court, pursuant to Michigan Court Rule 6.500, raising five claims, which were later amended and restated by counsel as follows:

I.      Newly discovered evidence justifies the grant of a new trial.

II.     The action of the prosecutor in acting as an unsworn witness prejudiced defendant and requires a new trial.

III.    Defendant should have a new trial because of ineffective assistance of counsel.

      A.     Failure to question and present evidence about the prior inconsistent statement of Officer Bivens that contradicted prosecution testimony.

      B.     Failure to question and present evidence about Melvin Mann saying that he saw the shooter, but it was someone he never saw before.

IV.     Defendant should have a new trial because of the prosecutor's knowing use of perjured testimony that she failed to correct.

V.      Defendant had ineffective assistance of appellate counsel.

VI.     Defendant's issues should properly be heard on the merits.

*See* App. for Leave to Appeal 3-6, State v. Malone, Case No. 127437.

It appears that the motion was supported by affidavits from three witnesses, obtained in the spring of 2002 presumably with the assistance of counsel. These documents were filed in this Court as well as part of an appendix to the habeas petition. Renate McCoy, whose presence at trial was waived by petitioner's counsel, signed an affidavit that reads:

1. On July 26, 1988 I was in my mother's backyard at 15916 LaSalle with my then-boyfriend Frank Temple and the children. This was close to the Puritan Super Food Market on Puritan and LaSalle.
2. Frank alerted me to a man with a gun. I looked and saw two men running down the alley toward the food market. The one with the orange shirt had a gun. I tried to get the kids into the house. While still outside I heard 3 shots, one right after another.
3. I did not recognize the men who were running with the gun.
4. I informed the police of this when I was interviewed on August 1, 1988. I signed a witness statement in the matter. In the report, I mention a man known as Cats. The real man of Cats is Carey Jackson.
5. The police did not ask me if the man I saw was Donald Malone. In fact, I knew Donald Malone from school. I am certain that neither of the men running down the

alley with the gun was Donald Malone. Frank Temple did not attend school with me and Mr. Malone.

6. I described the men to police as follows: Man with the gun: black male, early 20's, light complexion, 6 feet tall, about 170 pounds, short hair cut, wearing orange s shirt, blue jeans, blue and white or black and white gym shoes, carrying a black pistol in his right hand. Other man: black male, maybe early 20's, about 150 pounds, dark complexion, natural hair about one inch to two inches long, wearing a blue shirt, blue jean, dark gym shoes.

7. If I had attended the trial as a witness, I would have testified to these facts. However, during the trial on 1989, I was hospitalized with pneumonia for a period of 28 days and I was unable to attend the trial. No lawyer interviewed me about the case.

8. I am a black female with date of birth 11-8-65. The attached report, which I have initialed, is the report I signed, however, when I signed it, there were not large portions of it blacked out like there is now.

Pet., Ex. 7, Renate McCoy Aff.

The petitioner also submitted the affidavit of Kai McKinnie, which reads:

1.   In 1987 and 1988 I was working for the Maurice Eaddy drug organization. Other employees of Mr. Eaddy that I worked with selling cocaine were Melvin Mann an Orlando Randy Nance.

2.   In February 1988 Mr. Nance and I were instructed to pick up $9000 and return it to Mr. Eaddy. However, Mr. Nance and I stole the money instead of bringing it to Mr. Eaddy. Mr. Nance and I dropped out of sight for months.

3.   Later in 1988 Mr. Nance and I came into contact with Melvin Mann. Mr. Mann told us that if Mr. Nance and I would come back to work for the Eaddy's, we could work off the debt and all would be forgiven. I did not believe Mann and did not comply. Randy Nance did comply, and started working selling drugs with Mann.

4.   Shortly after returning to work for the Eaddy's, Randy Nance was shot and killed. I had a conversation with Melvin Mann about the killing. Melvin Mann told me that the killing of Randy Nance was over the stolen money. Mr. Mann admitted that he had set up Randy, by bringing him to the location where he was to be killed. Mr. Mann stated that he did that because he was known to have been friendly with Mr. Nance and I, and needed to set Randy up to be killed to prove his loyalty to Maurice Eaddy.

5.   Upon hearing this information I went down south to get away so that I would not be killed as Randy Nance was. I kept my whereabouts a secret from my Detroit acquaintances so the information would not get back to the Eaddy drug organization. The next year, 1989, I returned to Michigan and was

arrested, spending about one year in the Oakland County Jail.  I was released in 1990.

6.      After getting out of jail I was located by Maurice Eaddy.  Mr. Eaddy shot at me, but I received only a bullet wound in the buttocks and did not die.  I again made myself difficult to find.

7.      Now that Maurice Eaddy and Melvin Mann are serving time in federal prison for drugs, I feel safe enough to come forward with my information.  I did not come forward at the time of the trial of Donald Malone because I was afraid of Maurice Eaddy and his organization, and because I did not want to admit my own involvement of drug dealing.   Also, I was unaware that Donald Malone was being tried for the murder of Randy Nance and the date of that trial.  If I had been found by Mr. Malone or his lawyers I would have refused to testify.

Pet., Ex. 8, Kai McKinnie Aff.

The third affidavit is from Eddie Joe Hines, who witnessed two people fleeing the market.

He avers:

1. On July 26, 1988 I was on a porch on LaSalle Street in Detroit with several other people.  This was close to the Puritan Super Food Market on Puritan and LaSalle.
2. I observed a small black car drive up and stop in the street.  Two men ran out in the direction of the Food Market.  I heard shots from down by the Food Market.  I did not recognize either of the two men.
3. I am certain that neither of the two men was Donald Malone.  I knew Donald Malone from seeing him in the neighborhood.
4. I do not recall anyone questioning me about the incident.  I do not recall anyone asking me to appear in court as a witness.  I never received a subpoena to testify.

Pet., Ex. 9, Eddie Joe Hines Aff.

The petitioner also attached two redacted police reports describing interviews with witnesses.

One interview involved a 19 year old black female and the other involved a 21 year old black female.  Other identifying information was blacked out.

The first report, dated July 30, 1988, involves a witness identified as "B/F/19," with a date of birth of June 13, 1969.  It states:

Q. Ms [redacted], there is a blue jeep in the garage at the rear of your house.  Do you know who it belongs to?

A. Randy I guess. He was always riding it. His last name is Nance.

Q. How did the jeep come to be in your garage?

A. Last night after 11:30 p.m., or around 12 mid, me, and my sisters [redacted] and [redacted] were sitting on the porch. I saw a . . . pick up truck come around the corner. The truck pulled up into the driveway and [redacted] was driving. He got out, came up on the porch, said high [sic], and went in. He didn't come back out the front, but he went out the back. He came down the driveway, stood there for a minute, as if watching something in the back. He seemed to be real mad. He stayed for about a half an hour, and said he was leaving. He left in the truck. It was a black, [illegible] color, with like [redacted] on the back which was white. It had rust spots all over it.

. . .

Q. What have you heard about Randy's death?

A. I heard [redacted] say last night that he got a good look at the guy, but that he had not seen him before.

Pet., Ex. 4a.

The second report is dated August 1, 1988, and relates to a witness identified as "B/F/21," with a birth date of November 8, 1965. In her affidavit, McCoy claims that she was the witness interviewed in this report, which reads:

Q. Mrs. [redacted], what can you tell me about the shooting incident that occurred on 7-26-88 at Puritan Super Foods parking lot?

A. Me, and my friend [redacted] was in my mother['s] back yard weeding the garden. We had the kids out there with us. The kids were playing, [redacted] told me to get down, two guys had just ran past with a gun, I look up and I saw two guys going down the alley toward the store. I saw a small gun in the guy's right hand that was wearing the orange shirt. I was trying to get my kids into my mother's back door. I heard three shots one right after the other, "bang bang bang." This was less than thirty seconds after I saw the two guys and the one that had the gun.

. . .

Q. Did you recognize the person that had the gun?

A. No, but he was a black male, early 20's, light complexion, 6 feet tall, about 170 lbs, short hair cut, wearing orange T/shirt, blue jeans, blue and white or black & white gym shoes. He had a black pistol in his right hand.

Pet., Ex. 4b.

On July 15, 2003, the state trial court issued an order denying the petitioner's motion for relief from judgment. The trial court found that the petitioner could have raised those issues in his appeal of right, and the petitioner's claim of newly discovered evidence failed because that evidence could have been discovered earlier with due diligence, and the evidence was impeachment evidence.

The petitioner then filed a delayed application for leave to appeal in the Michigan Court of Appeals, which denied it on August 20, 2004, and an application for leave to appeal in the Michigan Supreme Court, which was denied on May 31, 2005 because the petitioner failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D). *People v. Malone*, 472 Mich. 917, 696 N.W.2d 718 (2005).

Thereafter, the petitioner through counsel filed the a petition for a writ of habeas corpus, in this Court presenting the following claims:

I.    Petitioner was denied due process where the trial court refused to grant a new trial despite newly discovered evidence of Petitioner's innocence and false testimony given at trial.

II.   Petitioner was denied due process where the action of the prosecutor, in acting as an unsworn witness, prejudiced petitioner and requires a new trial.

III.  Petitioner was denied a fair trial by the ineffective assistance of counsel.

IV.   Petitioner was denied a fair trial by the prosecutor's knowing use of perjured testimony that she failed to correct.

V.    Petitioner was prejudiced by ineffective assistance of appellate counsel.

The respondent filed an answer to the petition claiming that the first ground lacked merit, and the second, third, and fourth grounds were procedurally defaulted. The respondent did not explicitly address the fifth ground in his answer.

II.

Although the crime in this case occurred in 1988, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), govern this case because the petitioner filed his habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). That Act "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts normally are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) ( internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1)

("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11; *see also Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

<div align="center">A.</div>

The petitioner first contends that the state courts' refusal to set aside his conviction or grant him a hearing on his newly discovered evidence claims denied him due process of law. The petitioner's claimed newly discovered evidence consists of three affidavits of witnesses who did not come forward or were unable to present exculpatory testimony at trial. The petitioner offers those affidavits to show that "he is innocent, and was convicted on the basis of false testimony." (Petitioner's Brief, p. 8.) The respondent replies that the petitioner's claim fails to establish a constitutional violation sufficient to warrant federal habeas review.

According to well-established Sixth Circuit precedent, the petitioner faces an insurmountable obstacle in attempting to advance this claim. In *Cress v. Palmer*, 484 F.3d 844 (6th Cir. 2007), the court summarized the state of the law, which does not recognize a free-standing claim of innocence as the basis of granting a writ of habeas corpus. Since the decision governs the present case, it is quoted at length here:

> The easiest claim to analyze is the petitioner's challenge to the validity of the state court's conduct of his post-conviction litigation, with respect to the denial of the opportunity to present recantation evidence. As the district court noted, the Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review. *See Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002). We have clearly held that claims challenging state collateral post-conviction proceedings "cannot be brought under the federal habeas corpus provision, 28 U.S.C. § 2254, "because 'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal

<div align="center">-16-</div>

custody.'" *Kirby*, 794 F.2d at 246 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484, (1973)); *see also Pennsylvania v. Finley* 481 U.S. 551, 557 (1987) ("States have no obligation to provide this avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." (citation omitted)).

. . .

[C]ase law from this circuit supports the conclusion that Cress's third claim is, likewise, not cognizable. Cress contends that, given "overwhelming" proof of his innocence, his continued incarceration violates his due process rights, an argument that has been characterized as a free-standing innocence claim when not coupled with allegations of constitutional error at trial. *See Schlup v. Delo*, 513 U.S. 298, 314-17 (1995) (explaining the difference between a procedural innocence claim, which can permit a petitioner to transcend procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive innocence claim, which is " 'itself a constitutional claim'" (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993))). In the wake of *Schlup,* we have repeatedly indicated that such claims are not cognizable on habeas. *See, e.g., Zuern v. Tate*, 336 F.3d 478, 482 n.1 (6th Cir. 2003) ("The Supreme Court has held that newly discovered evidence does not constitute a freestanding ground for federal habeas relief but, rather, that the newly discovered evidence can only be reviewed as it relates to an 'independent constitutional violation occurring in the underlying state criminal proceeding'" (quoting *Herrera*, 506 U.S. at 400); *Staley v. Jones,* 239 F.3d 769, 780 n.12 (6th Cir. 2001) (federal habeas jurisdiction "require[s] a claim of legal error in the original proceedings"). *But see House v. Bell*, 311 F.3d 767, 768 (6th Cir. 2002) (*en banc*), *opinion after certified question denied,* 386 F.3d 668 (6th Cir. 2004), *rev'd and remanded,* --- U.S. ----, 126 S. Ct. 2064, 165 L.Ed.2d 1 (2006) (noting that "[t]he Supreme Court has assumed that 'in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant habeas relief *if there were no state avenue open to process such a claim* '" and therefore certifying questions to state court "in order to ascertain whether there remains a 'state avenue open to process [petitioner's freestanding innocence] claim'" (quoting *Schlup*, 513 U.S. at 314 n.28, quoting *Herrera,* 506 U.S. at 417) (O'Connor, J., concurring))) (emphasis added in *House* ).

The Supreme Court considered a free-standing innocence claim in *Herrera*. . . . The Court reviewed its habeas jurisprudence and observed: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400. Although the Court noted that it had not previously held that a free-standing innocence claim was cognizable on habeas, it would

> . . . assume, for the sake of argument in deciding [Herrera's] case, that in a
> capital case a truly persuasive demonstration of "actual innocence" made

after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

*Cress*, 484 F.3d at 853-855.

The petitioner's legal claim here is virtually indistinguishable from that in *Cress*. The petitioner offers evidence that was not presented at trial and tends to undermine the state's identification evidence. However, although the evidence certainly would have been relevant and may have caused the jury to take a different look at the facts, the failure of the state court to grant a post-conviction motion seeking a new trial is not a claim that raises a constitutional issue upon which a habeas writ might rest. The petitioner's claim of newly discovered evidence does not state a claim upon which habeas relief can be granted.

## B.

In his second and fourth habeas claims, the petitioner argues that the prosecuting attorney committed misconduct that deprived the petitioner of a fair trial. The respondent contends that the petitioner's prosecutorial misconduct claims are procedurally defaulted because his attorney failed to object to the prosecutor's conduct at trial or on direct appeal and the issue was not raised until post-conviction collateral proceedings.

The Supreme Court has described doctrine of procedural default as follows:

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Although the procedural default doctrine precludes habeas relief on a defaulted claim absent satisfaction of the cause-and-prejudice test, the doctrine is not jurisdictional. *Trest v. Cain*, 522 U.S. 87, 89 (1997); *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005). Therefore, although the Court would ordinarily resolve the procedural default issue first, "judicial economy sometimes dictates reaching the merits [of a claim] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); *see also Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997); *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) ("[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.").

Prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). However, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Prosecutorial misconduct will form the basis for a new trial and habeas relief only if the alleged misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "To constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *Byrd v. Collins*, 209 F.3d 486, 529-30 (6th Cir. 2000) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). The first question to consider is whether the prosecutor's conduct or remarks were improper. *Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 2977 (2007). If they were, the court must decide whether the improper acts were so flagrant as to warrant relief. *Id*. at 516.

Flagrancy depends on four factors: 1) whether the actions "tended to mislead the jury or prejudice the defendant"; 2) whether the actions were isolated or represent a pervasive course of conduct; 3) whether the acts represent a deliberate attempt to affect the outcome of the case; and 4) the overall strength of the case. *Millender*, 376 F.3d at 528.

One instance of prosecutorial misconduct cited by the petitioner references the series of questions the prosecuting attorney asked Carey Jackson that suggested the answer and effectively made the attorney an unsworn witness not subject to cross-examination. The petitioner contends that this conduct is similar to the conduct condemned by the Supreme Court in *Berger*. In *Berger*, the United States attorney had asked several questions to the defendant that the Court found to be improper because those questions implied that the prosecutor had special knowledge of a witness interrogation, and his questions conveyed that unsworn evidence to the jury. The "evidence" was never substantiated at trial through proper testimony. The petitioner claims that the Supreme Court has employed special scrutiny when the prosecutor's misconduct prejudices a separate constitutional right possessed by the petitioner, as when the prosecutor improperly comments on the petitioner's decision not to testify. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974). The constitutional right cited by the petitioner in this instance is the right to cross-examine witnesses secured by the Confrontation Clause.

The Sixth Circuit has held that the prosecutor may not ask questions implying other bad acts of a defendant and state that he or she will prove those acts when the state had already rested and could not present any additional evidence. *Maurino v. Johnson*, 210 F.3d 638, 647 (6th Cir. 2000), *implicitly overruled on other grounds as recognized by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000). However, the Sixth Circuit recently found that a prosecuting attorney did not commit

prosecutorial misconduct when he asked the following questions, which roughly parallel the dialog

between the state prosecutor and the witness in this case:

> Gray [the prosecutor]: Tell the jury what I told you Mr. Johnson [sic-Davis], Saturday morning
> . . .
> Gray: What did I say to you about this case in terms of what you knew when I talked to you?
> . . .
> Gray: Now, on Monday, of this week you came to our office with you [sic] attorney, is that correct? . . . At that time you sat down and gave us a detailed statement of what you have just told the jury, right?
> . . .
> Gray: Prior to doing that on Monday I told you that you had immunity in this case if you would testify, is that correct . . . if you told the truth about what you knew about it, is that right?

*Johnson v. Bell*, 525 F.3d 466, 483 (6th Cir. 2008).

In contrast to *Berger* and *Maurino*, the prosecuting attorney's questioning in this case was

not improper because she introduced evidence to prove that Jackson made the statement referred to

during the examination. The state offered the testimony of police officers Hall and Butler, who

established what the prosecutor insinuated during the questioning. Under these circumstances, the

attorney's conduct was not improper.

Nor is there a violation of the Confrontation Clause. Questions posed by an attorney to a

witness does not make the attorney a witness against the accused. *See Jordan v. Hurley*, 397 F.3d

360, 363 (6th Cir. 2005) (holding that prosecutor's use of leading questions on direct examination

did not violate Confrontation Clause).

The second instance of alleged prosecutorial misconduct is the supposed knowing use of

perjured evidence at trial. In order to establish relief on such a claim, the petitioner "must show (1)

that the prosecution presented false testimony (2) that the prosecution knew was false, and (3) that

was material." *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005). "Moreover, the [petitioner] must show that the statement in question was 'indisputably false,' rather than merely misleading." *Byrd*, 209 F.3d at 517 (quoting *United States v. Lochmondy*, 890 F.2d 817, 823 (6th Cir. 1989)).

The petitioner relies on two examples to prove his claim. First, three witnesses testified that Melvin Mann led the police to the vehicle. *See* Tr. 4-6-89 at 89 (Melvin Mann's own testimony); *id.* at 211 (testimony of officer Robert Bulgarelli); Tr. 4-10-89 at 62-63 (testimony of officer James Bivens). According to the petitioner, this testimony is contradicted by a police report that states that a 19-year-old female led police to the vehicle, not Mann. However, the petitioner has not shown that the testimony is "indisputably false," *see Byrd*, 209 F.3d at 517, as his characterization of the police report is incorrect. The female in the police report simply discusses the vehicle in response to the officer's question, "there is a blue jeep in the garage at the rear of your house. Do you know who it belongs to?" *See* Pet., Ex. 4a. This does not support the petitioner's claim that the unidentified witness, rather than Mann, took the police to the vehicle. To the contrary, the officer's question suggests that the police had already located the vehicle prior to meeting with the witness.

The inconsistency, if there is one, lies in the dates of the two statements. Mann testified that he led the police to the vehicle on July 31, 1988, while the unknown nineteen-year-old witness in the police report answered questions about the vehicle on July 30, 1988. Nevertheless, the petitioner has not demonstrated that this inconsistency proves the prosecution's knowing use of false testimony that was material. *See Abdus-Samad*, 420 F.3d at 625-26. At most, it suggests a discrepancy that has little bearing on the identification issue, which was the main issue at trial.

The second point of discrepancy alleged by the petitioner comes from Melvin Mann's identification of the petitioner as the one who did the shooting. The petitioner points out that in the

police report, the unidentified nineteen-year-old black female stated that she heard a person (whose name was redacted from the report) say that he had not seen the shooter before. The petitioner reasons that the redacted person's name must have been Mann, which shows that Mann in fact did not recognize the shooter, and his contrary testimony at trial was perjurious. Alternately, if the redacted person was not Mann, the petitioner should have been made aware of that witness's identity so that he could investigate. This claim must fail because, even if the reference that was redacted was to Mann, this inconsistency does not establish the knowing presentation of perjured testimony. *See Foley v. Parker*, 488 F.3d 377, 392 (6th Cir. 2007) (holding that the fact that the witness had made a number of contradictory statements over the years did not show that the prosecutor put on perjured testimony). At most, it shows that there was an inconsistency that could have been explored, but the discrepancy does not suggest that the prosecutor knew that Mann's identification testimony was false.

The petitioner's argument might be viewed as a claim that the prosecuting attorney committed misconduct by suppressing material evidence, as he cites *Giglio v. United States*, 405 U.S. 150 (1972) for the proposition that "suppression of material evidence justifies a new trial." Pet. 46.

In *Giglio*, the Supreme Court held that the due process clause requires that the prosecution provide to the defense impeachment evidence in the form of promises made to witnesses in exchange for testimony. 405 U.S. at 151; *Wilson v. Parker*, 515 F.3d 682, 701 (6th Cir. 2008). However, the failure of a prosecution to turn over favorable evidence warrants habeas relief only when "'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Johnson v. Bell*, 525 F.3d 466, 478 (6th Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). "The Supreme Court has held that error of

constitutional magnitude occurs only when the production of the evidence would have created a 'reasonable probability' of a different result." *Bell v. Bell*, 512 F.3d 223, 236 (6th Cir. 2008) (en banc) (quoting *United States v. Bagley*, 473 U.S. 667, 676-77 (1985)). Here, the petitioner has not shown that there is a "reasonable probability" that his possession of the redacted information in the police reports would have changed the result in his case. *See ibid.* Therefore, he is not entitled to relief on his claims of prosecutorial misconduct.

<div align="center">C.</div>

In his third and fifth habeas claims, the petitioner alleges that trial counsel and appellate counsel were ineffective for various reasons. He says that trial counsel was ineffective for failing to impeach the officers with a prior inconsistent statement and failing to introduce evidence that Mann said he saw the shooter, but it was someone he had never seen before. Appellate counsel was ineffective, argues the petitioner, because he failed to raise the legal issues on the petitioner's direct appeal that are raised in this petition.

The respondent contends that these claims are barred by the doctrine of procedural default because the petitioner did not raise them until his post-conviction motion. Ineffective assistance of appellate counsel claims plainly cannot be raised on direct appeal as they do not arise before the appeal. *Hicks v. Straub*, 377 F.3d 538, 558 n. 17 (6th Cir. 2004) ("Petitioner did not procedurally default his claim of ineffective assistance of appellate counsel. State collateral review was the first opportunity that petitioner had to raise this claim."). The petitioner raised his ineffective assistance of appellate counsel claims at his first opportunity to do so, in his motion for relief from judgment. *See Tucker v. Renico*, 317 F. Supp. 2d 766, 772-73 (E.D. Mich. 2004). Moreover, post-conviction motions are more suitable for addressing claims of ineffective assistance of trial counsel. *See United States v. Barrow*, 118 F.3d 482, 494 (6th Cir. 1997) (noting that in the federal forum, "'[t]he more

preferable route for raising an ineffective assistance of counsel claim is in a post-conviction proceeding under 28 U.S.C. § 2255,' whereby the parties can develop an adequate record") (quoting *United States v. Carr*, 5 F.3d 986, 993 (6th Cir. 1993)).  In this case, the petitioner raised the claims of ineffective assistance of trial and appellate counsel in state post-conviction proceedings analogous to the procedure set out in section 2255.

To prevail on a claim of ineffective assistance of counsel, the petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Carpenter v. Mohr,* 163 F.3d 938, 946 (6th Cir. 1998), *reversed on other grounds sub nom Edwards v. Carpenter*, 529 U.S. 446 (2000).  The deficient-performance prong of this test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The prejudice prong of the test requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The petitioner contends that his trial counsel was constitutionally ineffective because he failed to cross-examine witnesses with the prior inconsistent statements that formed the basis of his claim of prosecutorial misconduct.  An attorney renders deficient performance when he "fail[s] to challenge the credibility of the prosecution's key witness." *Higgins v. Renico*, 470 F.3d 624, 663 (6th Cir. 2006).  The Sixth Circuit has held that failure to impeach the "key identifying witness" at trial with prior inconsistent statements from a previous trial was constitutionally deficient. *Blackburn v. Foltz*, 828 F.2d 1177, 1183-84 (6th Cir. 1987).  More recently, the Sixth Circuit confirmed that the failure of an attorney to cross-examine "*the* key witness in the case" constitutes

ineffective assistance of counsel when the witness had made prior inconsistent statements. *Higgins*, 470 F.3d at 663.

This case was based primarily on the testimony of Melvin Mann, who initially was a suspect in the murder. Mann was the only witness who witnessed the shooting who testified at trial. His clear identification of the petitioner was perhaps the most significant piece of evidence presented at trial, and his credibility was important. Although the prosecution corroborated his testimony with statements of two other witnesses – Carey Jackson (who expressly repudiated his statement when testifying on the stand) and Robin Lasenby (who initially refused to testify at the preliminary examination and was jailed for three or four days until he cooperated) – who identified the petitioner running away from the scene after the incident, Mann's testimony was by far the most damaging.


However, the petitioner's attorney did cross-examine Mann. He cross-examined Mann about whether he saw the shooter's profile or simply his back. He asked why Mann chose to evade the police after the shooting, and why he concealed evidence of the shooting. The police reports may or may not refer to Mann; the petitioner's attorney may have made a strategic decision to limit cross-examination to those pieces of evidence that conclusively cast doubt on Mann's testimony. The Court cannot say that the attorney's performance was objectively unreasonable. *See Strickland*, 466 U.S. at 687. The petitioner is not entitled to habeas relief on this claim.

The petitioner also challenges the adequacy of his appellate counsel for failing to raise on direct appeal the issues raised in the petition. The standard of review for assessing whether appellate counsel was unconstitutionally ineffective also is based upon *Strickland*. A criminal defendant has no constitutional right to have every possible legal issue raised on appeal, *Jones v. Barnes*, 463 U.S.

745 (1983), and tactical choices regarding issues on appeal "are properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

The petitioner's appellate attorney was not ineffective for failing to raise these claims. As noted previously, the petitioner has not identified any meritorious instance of ineffective assistance of trial counsel or prosecutorial misconduct. "[T]here can be no constitutional deficiency in counsel's failure to raise meritless issues." *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999). The petitioner is not entitled to relief on his ineffective assistance claims.

III.

For the foregoing reasons, the Court finds that the petitioner has not shown that he is in custody in violation of the Constitution of the laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dk#1] is **DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 29, 2008

<div style="border:1px solid #000;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 29, 2008.

s/Felicia M. Moses
FELICIA M. MOSES

</div>